AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

DISTRICT OF RHODE ISLAND

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

One Richmond Square, Suite 310-E, Providence, Rhode Island, as more fully described in Attachment A

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

CASE NUMBER: 1:05M-03M

I JASON A. SIMONIAN being duly sworn depose and say:

I am a(n) Special Agent, Food and Drug Administration (Official Title) and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
One Richmond Square, Suite 310-E, Providence, Rhode Island, a suite located on the third floor of a complex known as One Richmond Square as more fully described in Attachment A.

in the City of Providence District of Rhode Island
there is now concealed a certain person or property, namely (describe the person or property to be seized)
SEE ATTACHMENT B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

concerning a violation of Title 18 United States code, Section(s) 1341; 1343; 1956(a)(1)(A)(i).
The facts to support a finding of Probable Cause are as follows:
See attached Affidavit of Special Agent Jason A. Simonian, Food and Drug Administration

Continued on the attached sheet and made a part hereof. ☒ Yes ☐ No

Jason Simonian
Signature of Affiant

Sworn to before me, and subscribed in my presence

01-06-2005 at Providence, Rhode Island
Date City and State

David L. Martin, United States Magistrate Judge
Name and Title of Judicial Officer

David L. Martin
Signature of Judicial Officer

5

This form was electronically produced by Elite Federal Forms, Inc.

I, Jason A. Simonian, being first duly sworn, depose and state as follows:

## I. Introduction

1. I am a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations (FDA/OCI), and have been so employed since September of 1997. I am assigned to the Boston, Massachusetts Resident Office. Prior to my employment with FDA, I conducted criminal investigations as a Special Agent with the U.S. Department of Labor for eight (8) years. I have attended numerous federal agency sponsored training courses and the Federal Law Enforcement Training Center. I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and other federal statutes enforced by FDA.

2. This affidavit is submitted in support of a search warrant for The Northeastern Institute for Advanced Natural Healing, which operates at the address of One Richmond Square, Suite 310-E, Providence, Rhode Island.

3. This affidavit is also submitted in support of a seizure warrant for Citizens Bank Account No. 1452-751-0. The account constitutes evidence of the commission of a criminal offense, or constitutes contraband, fruits of crime, or things otherwise criminally possessed within the meaning of Fed.R. Crim. P. 41(b), and is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and, therefore, may also be seized pursuant to 18 U.S.C. § 981(b).

4. As part of my duties as a Special Agent with FDA/OCI, I am currently investigating allegations of the following illegal activity: (1) Mail Fraud in violation of 18 U.S.C. § 1341, which makes it a federal crime for a person, having devised or intended to devise a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme, to place or cause to be

placed in any post office or authorized depository for mail or to take or receive there from any matter or thing; and, (2) Wire Fraud, in violation of 18 U.S.C. § 1343, which makes it a federal crime for a person, having devised or intended to devise any scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, to transmit or cause to be transmitted by wire, radio or telephone communications in interstate commerce any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

5. In addition, I am investigating allegations of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A) (i), which makes it a federal crime to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce which involve the proceeds of a specified unlawful activity, in this case, Mail and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, with the intent to promote the carrying on of said specified unlawful activity. To that end, I am seeking a seizure warrant for forfeiture of Citizens Bank Account No. 1452-751-0, pursuant to 18 U.S.C. § 981(a)(1), which provides for the seizure of any and all property which was involved in the transactions constituting money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

6. FDA is the agency of the United States Government charged with the responsibility of protecting the American public by enforcing the FD&C Act, 21 U.S.C. § 301-397, to ensure that, among other things, drugs and medical devices sold for use by or upon humans and animals are safe and effective and bear labeling containing true and accurate information.

7. Since April of 2004, your affiant and investigators from the FDA/OCI Task Force, the United States Postal Inspection Service (USPIS), and the Internal Revenue Service-Criminal Investigation Division (IRS-CID), and individuals from the Rhode Island Department of Health (RIDOH) have conducted the investigation detailed below, which has established probable cause to believe that the above-described unlawful activity has been and is being perpetrated by and at the direction of Dr. John E. Curran, a Naturopath whose practice, The Northeastern Institute for Advanced Natural Healing, operates at the address of One Richmond Square, Suite 310-E, Providence, Rhode Island.

8. The information set forth in this affidavit is based on information obtained by your affiant and from other investigators involved in this case, interviews conducted by your affiant and other investigators, review of documents, and two separate undercover meetings with John Curran. The affidavit does not contain every fact known to me with respect to this investigation. Rather, it contains those facts that I believe to be necessary to establish probable cause for issuance of a search warrant for the premises of One Richmond Square, Suite 310-E, Providence, Rhode Island, and for the issuance of a seizure warrant for Citizen's Account No. 1452-751-0.

**II. <u>Premise to be searched</u>**

9. This affidavit is offered in support of a search warrant for the business premises of The Northeastern Institute for Advanced Healing, which is operated by John E. Curran. The Northeastern Institute for Advanced Healing is located at One Richmond Square, Suite 310-E, Providence, Rhode Island

10. One Richmond Square is a three-story brick office complex. A marking of One Richmond Square is located above the main entrance of the building. The premise to be

searched is located within One Richmond Square, at Suite 310 E, which is located on the third floor of the complex. The entrance door to the office is identified as "310 E".

11. Suite 301E, all of which is to be searched, is described as follows: Upon entering the suite there is a patient waiting area. To the right is a bathroom and to the left is a half door, which leads to the "Pharmacy" area. Supplement stock is in view on the shelves in the pharmacy area. A doorway, which leads from the waiting room to the main interior office, is located adjacent to the bathroom door. To the right of the main interior office is a room with "therapy" equipment. Across from that room is John Curran's office. Located on one side of Curran's office is a "thermal imaging room" and on the other side of the office is a room where exams are conducted. There is also door located next to the desk in the main interior office. It is unknown where this doorway leads. A diagram of the suite is attached as part of Attachment A.

## III. The Scheme

### A. Summary

12. The investigation has revealed that John Curran induces patients to purchase expensive treatment plans and/or alleged nutritional or therapeutic materials in order to cure them of alleged actual or imminent diseases that Curran claims to have diagnosed. Although he is not qualified to diagnose diseases, Curran advises his patients, among other things, that: (1) they have live parasites in their blood stream; (2) that they have a severely reduced number of blood cells; (3) that they have certain deficient "body functions;" (4) that they have worms in their blood; (5) that they have holes in their blood; and (6) that they have a life threatening disease. Curran provides the majority of his diagnoses by performing a "live blood analysis" or a "bio-meridian test." As is further described below, neither test is designed to diagnose disease.

13. Upon providing a patient with the diagnoses, Curran promotes and sells the use of his treatment programs or alleged pharmacological materials, the cost of which ranges from approximately $200 to $10,000. Curran accepts cash, checks or credit cards, or, alternatively, promotes a credit service provided by GE Capital that will provide his patients with a line of credit to purchase his services. The line of credit is referred to as a "Credit Care Card." Examples of what he sells are products referred to as "E-water", and a super "green drink." Curran claims that E-water is therapeutic water, but the investigation has determined it is regular distilled water that Curran labels as "E-water." The "green drink" appears to be a compilation of ingredients with no therapeutic value.

**B. <u>The Practice of Medicine</u>**

14. Under Rhode Island state law (R.I. Gen. Law § 5-37-1), the "practice of medicine" includes:

> the practice of allopathic and osteopathic medicine. Any person is regarded as practicing medicine . . . who holds himself or herself out as being able to diagnose, treat, operate, or prescribe for any person ill or alleged to be ill with disease, pain, injury, deformity or abnormal physical or mental condition, or who either professes to heal, offer or undertake, by any means or method to diagnose, treat, operate, or prescribe for any person for disease, pain, injury, deformity or physical or mental condition. In addition, one who attaches the title MD, physician, surgeon, D.O., osteopathic physician and surgeon, or any other similar word or words or abbreviation to his or her name indicating that he or she is engaged in the treatment or diagnosis of the diseases, injuries or conditions of persons shall be held to be engaged in the practice of medicine.

R.I. Gen. Law § 5-37-1.

15. Curran is not a licensed physician. However, the investigation has determined that Curran claims to have received a medical degree from St. Luke's School of Medicine located

in Liberia, Africa. In addition, he holds himself out in promotional materials as "Dr. John Curran, N.D., M.D." In addition, in his promotional materials, Curran also boasts other academic degrees such as a doctorate in naturopathy from the American Institute of Natural Healing, a doctorate of naturopathic medicine from the Southern College of Naturopathic Medicine and continuing education certificates from Brown University and Harvard University.

16. As outlined below, although Curran is not a licensed physician and cannot legally practice medicine, it is part of his scheme to lead his patients to believe that he has diagnosed serious medical conditions that require immediate attention. However, in response to a complaint filed against him with the R.I. Board of Medicine, and in order to avoid the Board's jurisdiction, Curran's lawyer, A. David Tammelleo, in March of 2003, advised the Board he is not subject to their jurisdiction because he "is not practicing nor purporting to practice medicine."

17. In the letter, Mr. Tammelleo also referenced R.I. Gen. Law § 23-74-14. Section 23-74-14 states in pertinent part that:

> All unlicensed health care practitioners shall provide to each unlicensed health care client prior to providing treatment a written copy of the unlicensed health care client bill of rights. A copy must also be posted in a prominent location in the office of the unlicensed health care practitioner. Reasonable accommodations shall be made for those clients who cannot read or who have communication impairments and those who do not read or speak English. The unlicensed health care client bill of rights shall include the following:
>
> (1) The name, unlicensed health care title, business address, and telephone number of the unlicensed health care practitioner;
>
> (2) The degrees, training, experience, or other qualifications of the practitioner regarding the unlicensed health care being provided, followed by the following statement in bold print:

> "The state of Rhode Island has not adopted any educational and training standards for unlicensed health care practitioners. This statement of credentials is for information purposes only.
> Under Rhode Island law, an unlicensed health care practitioner may not provide a medical diagnosis. If a client desires a diagnosis from a licensed physician, chiropractor, or acupuncture practitioner, or services from a physician, chiropractor, nurse, osteopath, physical therapist, dietician, nutritionist, acupuncture practitioner, athletic trainer, or any other type of health care provider, the client may seek such services at any time"

R.I. Gen. Law § 23-74-14 (emphasis added).

18. The investigation has revealed that, in compliance with R.I. Gen. Law § 23-74-14, Curran provides his clients with a document entitled "Client Bill of Rights," in which he advises patients that he is not a licensed physician and which states that an unlicensed health care practitioner may not provide a medical diagnosis. Despite his disclaimer, however, it appears that Curran's method of practice is to identify himself as "Dr. Curran" and to induce patients to believe that they are, or will become seriously ill, and that he can cure them or prevent disease.

**C. Naturopathy**

19. According to the Southwest College of Naturopathic Medicine, a licensed medical school located in Tempe, Arizona, Naturopathic Medicine is the philosophy of treating disease and restoring health using natural therapies. It strongly promotes prevention in health care and a non-invasive approach to treatment including: acupuncture and oriental medicine, homeopathy, botanical medicine, nutritional counseling, mind-body medicine, hydrotherapy and physical medicine.

20. Naturopathic physicians (NDs) attend a four-year graduate level naturopathic medical program and are educated in all of the same basic sciences as in conventional medical school. Studies concentrate on holistic and nontoxic approaches to therapy with strong emphasis

on disease prevention and optimizing wellness. Graduates sit for professional board exams to become licensed as naturopathic doctors within licensed states or as jurisdiction allows.

21. On his website, www.drcurran.com, Curran advises that Naturopathic Medicine "is a distinct medical system of healthcare: an art, science, and practice of diagnosing and treating people and preventing disease. It honors clients as unique human beings, enabling them to take responsibility for their own health. It is based upon the belief that the body has an innate natural ability to heal itself when given the appropriate internal and external healing environment."

22. Curran advises his patients through promotional materials that he is a Board Certified and Licensed General Practitioner of Naturopathic Medicine from the District of Columbia. Your affiant has reviewed an application that Curran submitted to the District of Columbia for a license. It appears that Curran paid $150 for the application. He represented in the application that he attended the American Institute of Natural Healing and competed 2200 hours of course work and received a naturopath degree/certificate in 1998. However, your affiant is not aware of any record that Curran is a licensed naturopathic "physician" who has taken any board exams.

**D. St. Luke's Medical School**

23. Your affiant has reviewed records from St. Luke's Medical School. Investigation by IRS/CID SA Ferraro identified a California based extension of St. Luke's School. In response to this investigation, St. Luke's provided SA Ferraro with a hand written response advising that the school has no records indicating that John Curran was ever a student at the college. SA Ferraro has advised your affiant that there is an ongoing federal investigation regarding the sale of fraudulent degrees with regard to St. Luke's School of Medicine.

### E. <u>The Northeastern Institute for Advanced Natural Healing</u>

24. The Northeastern Institute for Advanced Healing is an active licensed corporation within the State of Rhode Island. It is also a member of the Better Business Bureau (BBB). A review of the company's BBB application showed that the company is engaged in "alternative health care." John Curran, N.D. M..D. is listed as the Owner/Medical Director. Curran originally operated his business, then called Rhode Island Health Aid, at 743 Reservoir Ave., Cranston, RI. He moved the practice to his current Richmond Square address and changed the name of the business to The Northeastern Institute for Advanced Natural Healing in approximately July of 2002.

### F. <u>Live Blood Analysis</u>

25. Investigation by your affiant has determined that on April 10, 1997, John Curran, of 743 Reservoir Avenue, Cranston, Rhode Island, purchased a NuLife Sciences Laboratory Grade Research Microscope, Serial # 204134. The Microscope was sold to Curran by PSI Resource/NuLife Sciences, 2404 Vineyard Place, Boulder CO. Among other accessories, the device came with a Panasonic CCD Color Camera with transformer and microscope slides. The investigation has revealed that Curran uses the device to perform blood analysis and improperly diagnose disease.

26. Pursuant to the Federal Food, Drug, and Cosmetic Act, the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is: (1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation's, treatment, or prevention's of disease, in man or other animals; or (3) intended to affect the structure or any function of the body of man or other animals; and which does not achieve its primary intended purposes

> through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 201(h).

27. Your affiant has made contact with numerous individuals who hold various positions within FDA for assistance in this investigation. I have met with Beth Griffin, Engineer/Investigator for the FDA-New England District and provided her with documentation regarding the NuLife Sciences Laboratory Grade Research Microscope. Griffin has advised me that the device is not cleared or approved by FDA for use as a medical device.

28. In addition, Curran knows that the analysis is not to be used for diagnoses. On June 9, 1998, Curran, on behalf of RI Health Aid, sent a letter to the RIDOH regarding the subject of Live Blood Evaluation. In the letter, Curran writes that "[u]nder State and Federal Laws, people receiving services considered to be of an experimental research nature by the FDA-AMA must be informed of such. Nutritional live blood evaluation is of a nutritional nature and is not for a medical diagnosis, treatment, disease prevention, or health assessment. <u>All evaluations are screenings for research purposes only</u>."(emphasis added). Nonetheless, the investigation, as summarized below, has demonstrated that John Curran is utilizing this device in the diagnosis of disease, to include blood parasites, cancer, and white blood cell anomalies.

### G. <u>BioMeridian Stress Assessment</u>

29. Investigation by your affiant has determined that John Curran purchased a BioMeridian Stress Assessment Device from BioMeridian International. The BioMeridian Stress Assessment Device (which is also referred to as the Meridian Stress Assessment) is referred to as a "galvanic device" and cleared by FDA as a Class II medical device for the measurement of the

electrical resistance of the skin. Your affiant has reviewed sample printouts from the device and, in essence, they list different body systems and functions, such as heart, endocrine system, cellular metabolism and provide a reading for how each responds to the test. No galvanic skin response devices, including the BioMeridian Stress Assessment Device, are cleared or approved by the FDA for the use in the diagnosis of disease. Your affiant's investigation has determined that Curran uses this device in conjunction with the Live Blood Evaluation to provide diagnoses of diseases in patients, contrary to federal and state regulation.

**H. E-Water**

30. Your affiant has reviewed the promotional pamphlet that John Curran provides to his clients regarding E-Water. On that document, Curran states that "each drop of this water will refresh your body and increase your vitality. Homeopathy has proven that water has remarkable memory and capacity to store energy. This specially energized water contains the same synergistic healing properties as the water in Lourdes, France. - Dr. John E. Curran, N.D., M.D."

31. The document further claims that "Body Balancing E-Water is uniquely charged water wherein the molecules spin in the reverse direction and emit electrical energy which your body's organs absorb to function at its optimal capacity. The elderly, adults, and children as well as animals and plants, can benefit dramatically from taking this E-Water. It is recommended for ALL ages. This water does not act as a stimulant."

32. Your affiant has spoken to David Uliss, Chief - Forensic Sciences, RIDOH and provided him with a copy of the E-Water pamphlet. Subsequent to examining the document, Dr. Uliss advised your affiant that the claims were "ridiculous as a matter of science," advising that

water molecules are constantly spinning in all directions and that the notion of providing a charge for organ absorption was "absolutely without any scientific merit."

### I. The Machines

33. Your affiant is also aware that, as part of his sales pitch, Curran attempts to sell his patients a full treatment protocol that is to be performed by using certain machines, which have been described as follows: (1) hydrotherapy massage machine; (2) spectra collor spa system; (3) hyperbaric chamber; (4) hydro massager with infra red light; (5) ionic cleaner; (6) massage capsule; and (7) personal sauna with white plastic hoses. Each machine is discussed below in the context of Curran's representations about each to his patients or to an undercover agent.

### IV. Victims

34. As part of this investigation, your affiant and other investigators conducted interviews of the following former patients of Curran:

**RD:**[1]

35. In February of 2003, RD, a former patient of John Curran, provided a written complaint to the RIDOH regarding the treatment he had received from Curran. That statement provided the following information, in substance:

36. On September 30, 2002, RD went to see Curran at One Richmond Square, Suite 310E, for an initial consultation. Curran spent about a half -hour asking how RD was feeling. After the initial meeting, Curran asked RD to return the following week for some tests to see

[1] In the interest of confidentiality of the patients, only the initials for each patient are included herein.

what Curran could find. During the follow-up visit, Curran performed the Meridian Stress Assessment on RD. Curran claimed that the procedure tested for "food allergies" and "the body's vital functions." Curran presented RD with a computer printout of the foods RD was "allergic" to and told him that he was deficient on 55 of the 62 body functions that were tested. Curran performed a second test that involved getting a blood sample from RD's finger. Through a microscope image of the alleged drawn blood, Curran showed RD what he called "blood parasites" and told RD that his body was infected with them. Curran advised RD that he was "very sick" and that he needed a complete detoxification, which would cost him $4,500. RD subsequently signed a contract for the program and began the treatment.

37. Curran's treatment called for RD to stay on a liquid diet that consisted only of a product identified by Curran as the "Super Green Drink" formula for a period of four (4) weeks. The Super Green Drink Formula is a powder that Curran manufactures and sells to his clients. RD's weight when he started the liquid diet was 149 lbs. Three (3) weeks and three (3) days later, RD's weight had dropped to 124 lbs.

38. When RD called Curran to tell him he was down to 126 lbs., Curran indicated that he didn't care if RD lost another 25 pounds but advised that RD must stay on the diet, after which Curran proceeded to prescribe to him $208.33 worth of pills and other liquid formulas.

It took RD over a year to get back to his present weight of 150 lbs. RD advised that he paid Curran a total of $3500.

**ML:**

39. On August 11, 2004, ML, a former patient of John Curran, was interviewed by your affiant and provided the following information, in substance:

40. On July 22, 2004, ML had a complete medical assessment performed by Curran at One Richmond Square, Suite 310-E, for which ML was charged $950.00. As part of that examination, Curran performed numerous tests including a Meridian Stress Assessment and Live Blood Analysis. ML advised that Curran introduced himself as "doctor" Curran and wore a name tag that read "Dr. Curran." Additionally, ML advised that on the walls of his office Curran had four (4) certificates from various institutions including Harvard Medical School.

41. During the visit, ML stated that Curran told her that he had cured four (4) people who had Hepatitis C. After conducting the blood analysis test, Curran advised ML that she was infested with blood parasites and showed ML two slides that allegedly contained ML's blood. Curran pointed out "worms and eggs" that were ready to hatch within ML's blood. Curran told ML that she had "only one good blood cell with the others being deformed." Upon completion of the Stress Assessment Test, Curran provided ML with a printout of the results, which indicated that ML had five (5) out of (62) bodily function readings that were "good", with the rest being "stressed" or "weakened." ML informed your affiant that she was surprised at the results of her blood test because just a couple of weeks prior to her exam with Curran she had been to the hospital on an unrelated matter at which time a blood evaluation had been conducted and no abnormalities were found.

42. After providing ML with his results, Curran addressed a proper course of action. Curran took ML to a room in the office that contained various machines. Curran advised ML that using the machines was the "fast cure" to rid her of her parasite infestation. He proposed a treatment plan for $10,000.00 for a total of ten (10) visits which would allow her to use each of the machines. ML subsequently told Curran that the price was too expensive. Curran then stated

that he would return to his office and formulate the necessary list of items from his "pharmacy" that ML would need to be cured. ML stated that, some time later, Curran returned to the patient room and provided ML with a list of items totaling $5,000.00. Curran also provided ML with an application for a Credit Care card, which, if approved, would provide her with financing for Curran's services. ML filled out the application for the card, but advised the office not to forward her application until she had a chance to discuss the matter with her husband. ML also provided Curran's office with a check for $600.00 as an initial payment for the items Curran had listed and advised Curran that she would return the next day to provide payment in full. ML stated that she felt very pressured at the time of her visit to buy the prescribed "medications."

43. ML advised that after discussing her visit with her husband, and thinking about what had occurred during her visit, she felt as if she had been the victim of an attempted fraud. ML advised that she then contacted her bank (Sovereign Bank) and put a stop payment on the check she had provided to Curran.

**LM:**

44. On September 27, 2004, Bruce McIntyre at the RIDOH interviewed LM, a former patient of John Curran. LM provided the following information, in substance:

45. LM went to see Curran at One Richmond Square, Suite 310-E, after reading about him in a local health magazine. LM had her initial consultation with Curran on August 6, 2004. LM stated that she went to see Curran because she wanted to lose weight and stop smoking. After this initial consultation, Curran scheduled LM to come to the office for a complete medical assessment on August 13, 2004, for which LM was ultimately charged $950.00. LM advised that the medical assessment lasted between 4-5 hours. As part of the exam, Curran conducted several

tests including a live blood analysis and a stress assessment test. Subsequent to taking a blood sample from LM's finger, Curran advised LM that she was infested with blood parasites and that the parasites had been in LM's system a long time and had become "double-headed." After conducting the stress assessment, Curran produced a printout that he told LM indicated that she had four (4) out of (62) bodily functions that were good with the rest being "stressed" or "weakened." LM also informed that during her exam Curran told her that he had cured patients who had Stage IV Cancer.

46. Subsequent to advising her of his diagnosis, Curran provided LM with a list of items from his "pharmacy" that LM would need to take. Included on the provided list were a "Super Green Drink", a powder made by Curran that cost $1,195.00, and "Dr. Curran's Unique Body Balancing E-Water" that cost $45.00 per bottle and also was produced by Curran. In total, Curran charged LM $4,806.97.

**AD:**

47. On September 27, 2004, LD, the mother of AD, met with a member of the RIDOH and filed a complaint, including a written statement, regarding the treatment her daughter had received from John Curran. LD provided the following information, in substance:

48. AD (age 24), who is temporarily living in San Diego, was diagnosed with Celiac Disease (gluten and wheat allergies) while living in California. AD came home to Rhode Island for a week and decided to seek another opinion regarding her illness. Dr. John Curran was recommended. Curran listed himself as an MD as well as an ND, and that convinced LD and AD to utilize his services.

49. On Tuesday, August 31, 2004, AD had an afternoon appointment with Curran. Curran initially had a technician perform what he referred to as a Full Body Medical Imaging Scan. Curran then explained to AD that there were many blood and other tests that he needed to be performed to obtain an accurate diagnosis. Curran asked AD to return on Saturday, September 4, to complete those tests. AD was scheduled to fly back to San Diego on Sunday the 5th and had other plans for Saturday. Curran stated that he would be in his office later in the evening on Tuesday the 31st and that he would wait for AD in order to complete the tests. AD asked her mother, LD, to accompany her to Curran's office for the evening appointment.

50. At the onset of that appointment, Curran explained his testing procedures, and AD and LD subsequently went in to the examining room where the tests would take place. Curran proceeded to perform his exam. As part of that exam, Curran pricked AD's finger tips, put blood samples on a glass slab, put that slab under the microscope and projected the "living blood cells" onto a monitor, enabling both AD and LD to view what he proceeded to diagnose.

51. Curran showed what he stated were "parasites" living in AD's blood cells. He said that her blood was infested with these parasites and that her immune system was so overworked trying to kill them on a daily basis that when other germs and bacteria entered her system, the immune system was too tired to fight. Curran also showed LD and AD "white formations" in the cells, which he said were "holes" in the blood. He also showed what the "healthy" color of blood cells should be and what you wouldn't want to see for coloration. Curran showed another view of AD's cells and said they were tainted "green," which was an indication of early cancer. Curran advised that this was the "worst" blood work he had ever seen and advised LD that she had to picture AD standing on the edge of a cliff. Curran indicated that if AD were not treated

immediately, with drastic measures, AD would "fall off the cliff" within one to two years. Curran also told AD that she had thyroid problems and a dysfunctional pituitary gland that were making her age three years to every one. LD advised investigators that she was "devastated" upon hearing the diagnosis. However, Curran told LD and AD that this diagnosis was reversible, informing that "drastic measures were required for drastic situations." Curran claimed that he could cure AD with a very intensive ten-days of therapy.

52. Curran walked LD and AD into his therapy chamber and showed them a Hyperbaric Chamber, Hydrotherapy Massage Machine, and a SpectraColor Spa System. Curran stated that the theory behind the therapy was that he had to "kill" the parasites in her blood cells as quickly as possible with intensive heat, detoxify the body of nasty matter, supplement her diet with herbal treatments, and put her on a nutritional diet. Curran stated that the protocol would cost $10,000. Curran stated that he knew that LD and AD had a lot to digest but advised them "not to lose sleep over it." Curran explained to LD and AD that they could have a credit application prepared right then and there to see if they qualified for the cost of treatment. Curran advised that many of his patients were not prepared to come up with money out of pocket and utilized the credit service. Curran provided LD with an application for a CreditCare card which LD filled out and which was immediately submitted by the office. LD was approved for the issuance of credit prior to her leaving the office.

53. At the conclusion of the exam, LD was presented with a bill in the amount of $1355.33 for all of the tests conducted that night. Curran suggested that AD call her boss in California to say that she was delaying her return and to delay her flight back for a couple of

weeks. The next day, LD and AD were supposed to pick up a diet plan for AD, and AD was scheduled to begin therapy. LD wrote out a check for $1355.33 and left the office.

54. LD relayed Curran's diagnosis to her husband, ED, who suggested that AD see her primary care physician, Dr. Jennifer Jeremiah, prior to beginning treatment with Curran. On Thursday, September 2, 2004, AD met with Dr. Jennifer Jeremiah. AD informed her of everything Curran had said and showed her some of the test results. Dr. Jeremiah advised AD that she was the second of her patients who had visited Curran and who had been given a life-threatening diagnosis. Dr. Jeremiah subsequently conducted a full physical exam on AD, including blood work.

55. Your affiant has subsequently met with and spoken to Dr. Jeremiah, who advised your affiant that, with the exception of Celiac Disease, AD is a healthy 24-year-old with no indication of cancer or any other life-threatening illness. Her thyroid is normal, as is her pituitary gland. Dr. Jeremiah further informed your affiant that the only parasites that can be detected through blood work are those connected with malaria and that AD had not been exposed to malaria nor had any such symptoms.

56. LD informed investigators that she stopped payment on her check to Curran immediately and contacted her lawyer who forwarded a letter to Curran addressing this issue. The possible impact of the letter on this investigation is discussed below.

57. On October 19, 2001, your affiant and TFA Christopher Cardarelli met with LD at her residence. LD reiterated her statements previously made at the RIDOH. LD also added that during their time with Curran, Curran told LD that he had cured patients with Stage IV Cancer. (Curran made the identical claim to client LM).

**CR:**

58. On December 13, 2004, your affiant interviewed CR, a former patient of John Curran, at CR's residence located in Sterling, Massachusetts. CR provided the following information, in substance:

59. On November 30, 2004, CR went to see John Curran at One Richmond Square, Suite 310-E, after hearing about him from a work colleague. CR stated that he went to see Curran because he wanted to lose weight. Curran conducted a complete medical assessment exam for which CR was charged $950.00. CR advised that the exam lasted several hours. As part of the exam, Curran conducted several tests, including a live blood analysis and a stress assessment test. The first test Curran conducted was the blood analysis test. For that test, Curran took a blood sample from CR's finger which he placed on three glass slides. Curran placed the slides, one at a time, under a microscope that was hooked up to a computer monitor. Curran then reviewed the blood and advised CR that he had "clumpy" red blood cells. Curran further informed CR that his red blood cells had "holes in them." Curran stated that CR's white blood cells had a "glowing aura" around them and pointed out "inch worm" like creatures moving around CR's blood. CR stated that, after pointing out each one of these conditions, Curran would exclaim "that's not good" or "this doesn't look good." Curran also showed CR a pamphlet which had pictures of what "healthy" blood cells should look like and what one would not want to see. Curran's final diagnoses was that CR's immune system was fatigued and that he had a virus in his blood.

60. Subsequent to the blood analysis, Curran conducted a BioMeridian Stress Assessment test. After conducting test, Curran produced a printout that he told CR indicated that

CR had three (3) out of (62) bodily functions that were good, with the rest being "stressed" or "weakened."

61. After advising CR of his diagnosis, Curran provided him with a list of items from his "pharmacy" that CR would need to take to improve his health. Included on the list were the "Green Drink" formula and "Dr. Curran's Unique Body Balancing E-Water." Additionally, Curran scheduled a machine therapy protocol for CR which was intended to "pull the toxins out" of CR's body and "kill the virus" in CR's blood. CR advised that he agreed to purchase both the supplements and treatment program suggested by Curran.

62. To help him finance his treatment, CR filled out a Credit Care card application which was provided to him by Curran's office manager and approved for credit while CR was still at Curran's office. At the conclusion of his appointment CR's Credit Care account was charged the sum of $6,719.08 for the exam, supplements and therapy treatment program. CR has subsequently contacted Curran's office and notified them that he had decided not be participate in the therapy program and requested that his Credit Care account be credited for the corresponding charge (2,995.00). CR advised that he was told by someone at Curran's office that they would make the credit, however, as of December 3, 2004, no such credit had been issued.

## V. <u>Undercover Operation</u>

63. In addition to the above-cited patients, and as part of this investigation, an undercover, monitored, operation was initiated as described below.

### A. <u>Task Force Agent (TFA) Al Faella</u>

64. On September 17, 2004, TFA Albert Faella, while working in an undercover capacity, went to Curran's office located at One Richmond Square, Suite 310-E, Providence,

Rhode Island, for a previously scheduled exam. Your affiant has listened to a recording of that meeting as well as spoken to TFA Faella about that meeting which is summarized as follows:

65. As part of the exam, Curran pricked a blood sample from TFA Faella's finger and smeared the sample on three (3) individual glass sample slides. Curran subsequently requested a urine sample from TFA Faella for which TFA Faella had to exit the exam room. When TFA Faella returned with the requested urine sample, Curran was sitting in front of a microscope. TFA Faella sat in the chair next to Curran, looking at a monitor, which appeared to be wired to a camera mounted on the microscope. Curran appeared to TFA Faella to have a slide already in the microscope and pointed out to TFA Faella what his red and white blood cells looked like. Curran stated that the white blood cells should be perfectly round and proceeded to change the glass slide in the microscope. Curran tested the urine sample and stated that TFA Faella's urine was acidic at 5.0 which is completely acidic. Upon looking at the new slide, Curran stated that there was something wrong with TFA Faella's white blood cells because they were not shaped completely round and some were not fully-grown. Upon further examining the slide, Curran spotted what he called a "microimbulei." He stated that once one is seen, "they're like roaches", and guaranteed that there are "millions in the body," which Curran explained meant TFA Faella's " immune system is not functioning optimally or else it would not let anything grow in the body."

66. Curran also added that it looked like TFA Faella had a little bit of liver toxicity and spider webbing. Curran went on to say that TFA Faella had a lot of cell deformity and that his immune system needed total regeneration because Curran could not find one good cell. Curran advised TFA Faella that "they're all deformed" (referring to TFA Faella's white blood cells) and that if TFA Faella stayed like this that his immune system would allow other things to

grow and eventually become premature diseases. TFA Faella asked Curran if what he had been shown floating in his blood was a parasite and Curran responded "correct" and that it was easy enough to treat. Curran stated that he also had seen a couple of clots forming in TFA Faella's blood and observed eggs starting to grow, stating that within twenty-four hours the eggs would be huge. Curran went on to say that they (referring to the parasite eggs) are deep seated within the cells and the immune system cannot get at them. When asked by TFA Faella about how to get rid of the parasites, Curran replied that he was working on a program in his head.

67. Curran informed TFA Faella that the next slide in the blood test would show if the parasites had caused any damage to the body. While conducting this test, Curran explained that the bar graph on the monitor should show a solid red line and that any break in that line would indicate some type of weakness within the system. In conducting this test, Curran stated that he did see something happening in TFA Faella's system but did not know whether the condition would mature in six months or six years, and then revised his answer to one year, adding that this test would have to be performed every three months. Curran also observed some holes in TFA Faella's blood smear, which Curran stated indicated that something was starting to happen. Curran explained that when he sent other similar patients for scans they always come back positive for cancer. However, in the case of TFA Faella, Curran advised that he would be able to reverse the condition now, in this stage, quite easily. Curran went on to say that TFA Faella's fiber net is all broken which indicates glucose intolerance. Curran asked TFA Faella if he took any painkillers, to which TFA Faella replied "no" and inquired why Curran was asking. Curran stated that TFA Faella had a little discoloration of the blood and indicated that he (Curran) could see orange/greenish specks which indicate diseases. Curran stated that he has an eighty-percent

success rate and could get TFA Faella's blood back to that of a twenty-year-old. Curran went on to say that TFA Faella had adrenal stress which was sitting on top of his kidneys and causing fatigue and that he also saw purple in the blood sample which is a sign of malabsorbtion of nutrients.

68. In the next test he performed, Curran placed a clear liquid in the palm of TFA Faella's hand and had him grasp a small, approximately five-inch brass bar, which was connected to a computer system labeled BioMeridian Health Assessment test. Curran advised TFA Faella to grasp the bar loosely. Curran was holding on to a pen-like probe which he would push against TFA Faella's joints on the opposite hand and foot and then changed to the other side to complete the test. Curran explained that the testing system he was using was the most state of the art in the United States and that the test would measure the various bodily organs and lymphatics and determine whether something was wrong in one of the internal organs. Curran proceeded to explain how this is a very important test to have done at least once a year to determine if a body has disease in it or not. While conducting the test, Curran informed TFA Faella that he had gall bladder problems and that his kidneys were super-stressed. At the end of the testing, Curran stated that the printer was not working and he could therefore not supply a copy of the test, but would keep it in the file. He went on to say that out of the sixty-two tests the machine scans for, TFA Faella had only passed five of them, but that within a month Curran would have TFA Faella back in shape.

69. After completing the assessment test, Curran had TFA Faella sit on an exam table where he looked at TFA Faella's fingernails on both hands and indicated to TFA Faella that his oxygen system wasn't working properly. Curran went on to say that because he did not see any

half moons in the fingernails that it was a sign of degeneration and that 80 – 90 % of all his cancer patients have no moons in their fingernails. Curran also examined TFA Faella's tongue, took his body temperature, and checked his eyes. Curran stated that TFA Faella's pupils were pulsating, which meant that TFA Faella's glandular system was running out.

70. Upon completion of the exam, TFA Faella was instructed to get dressed and wait in Curran's office. Curran subsequently returned to the office and began to talk about several treatment protocols with TFA Faella. The first treatment discussed involved TFA Faella subsisting for a period of 30 days on only the Green Drink formula, 64 ounces of carrot juice a day and numerous other supplements Curran would supply to kill the parasites. Curran stated that this program would keep TFA Faella's blood squeaky-clean and heal everything. Curran went on to state that the only thing that worried him was the formation of TFA Faella's white blood cells because none of them were correct and he did not know why. But, Curran stated, in thirty days the cells would become perfectly round.

71. Curran then offered TFA Faella another treatment program to be done in addition to the above-cited supplement program. This therapy would last for a period of ten days and was intended to deactivate pesticides and heavy metals and excrete them as well as any deep seated microbes. Curran proceeded to show TFA Faella the therapy room that was located across his office and described each machine in the room and its function.

72. The first was a hyperbaric chamber which Curran stated was used for people who have had a stoke or brain damage and which supplies high-pressure oxygen. The next machine was a Hydro Massager which had an infra red light above it and, according to Curran, was supposed to stimulate the thyroid into producing healthy white blood cells. The beam saturates

the body, which deactivates microbes from reproducing as well as cancer cells, viruses and bacteria with a high frequency.

73. The next piece of equipment shown to TFA Faella was an ionic cleanser, a machine in which clients would put their feet. While the machine appeared to TFA Faella to be a simple foot massager, Curran advised that, while in use, a person could actually see the garbage coming out of the body and floating up in the water. Curran described the garbage coming out of the body as browns, greens and all sorts of different colors.

74. The next piece of equipment shown to TFA Faella was a massage capsule, in which a client would lie inside. The apparatus had a black light above it where a person's head would be. Curran stated the machine provided cold light therapy. Curran advised that the machine would reprogram the immune system and fight against infections.

75. The final piece of equipment that Curran showed TFA Faella was a personal sauna in which a person's head would be sticking out of the unit as it heats up. Attached to the unit were two small white plastic hoses from which Curran advised O2 and O3 were being pumped into the unit, which heats up to 110 degrees. According to Curran, O3 takes pesticides out of the cells.

76. Curran and TFA Faella then returned back to Curran's office to discuss which form of therapy would be best. Curran then advised that a full course of treatment, utilizing the above-described machines would cost $10,000.00. A plan involving only supplements would cost several thousand. Curran reiterated to TFA Faella that the $10,000.00 program was best, stating that it's the only form of treatment that will completely erase everything wrong with TFA Faella. TFA Faella advised Curran that his schedule would not allow him to use the machine

protocol and he would opt instead for the supplement program. Curran again tried selling a shorter time period machine-based treatment protocol, which TFA Faella refused. Curran then left the office to devise a supplement protocol for TFA Faella. Curran subsequently returned with a list of supplements for TFA Faella to purchase. The products included two supplements that Curran advised he produced himself. The first of these was the "E-water", which is bottled water bearing the said trade name. Curran advised that this water reverses the molecules in the body. The second was the "Green Drink" formula which, Curran claimed, contained every nutrient that the body needs. The E-Water was sold for a cost of $45.00 for a four-(4) ounce bottle and a white unlabeled bucket of green powder to make the "Green Drink" sold for a cost of $675.00.

77. TFA Faella purchased all of the supplements with official government funds, supplied by the FDA, using Sovereign Bank check No. 109 for the total sum of $3,729.00, which included the full body exam. Sovereign Bank subsequently provided your affiant with a copy of the cited check which indicated that it had been deposited into Citizens Bank, Account No.1452-751-0, held in the name of The Northeastern Institute for Advanced Natural Healing. Your affiant is aware of the process by which a check issued by Sovereign Bank is processed. Your affiant is aware that prior to the funds being deposited into Citizens Bank, Account No. 1452-751-0, a series of interstate bank wire transfers occurred culminating with the funds being deposited into the identified account.

78. On September 16, 2004, immediately following TFA Faella's exam with Curran, your affiant accompanied TFA Faella to Pawtucket Memorial Hospital, 11 Brewster Street, Pawtucket, RI. Upon arrival, Faella met with Dr. Noubar Kessimian, in a previously arranged

meeting, for the purposes of supplying Dr. Kessimian with a blood sample for testing for the presence of blood parasites. TFA provided the necessary blood sample, which was tested at Memorial Hospital. Dr. Kessimian subsequently provided your affiant with a printout of the lab results, which were negative for the presence of parasites. Dr. Kessimian has also advised your affiant that blood parasites are extremely rare and are almost exclusively found as a result of contracting Malaria, a disease not present in this geographical area.

**B. Postal Inspector (PI) Al Correia**

79. On October 8, 2004, Postal Inspector (PI) Al Correia, while working in an undercover capacity, went to the office of John Curran at One Richmond Square, Suite 310-E, as part of a previously scheduled exam. Your affiant has listened to a recording of that meeting as well as spoken to PI Correia about that meeting which is summarized as follows:

80. Upon PI Correia's arrival, Curran reviewed a pre-exam form filled out by PI Correia and advised that it was a typical "kill me diet." Curran stated that 99 percent of the people he treats are riddled with disease and, with PI Correia, Curran has an opportunity to stop it before PI Correia became diseased.

81. In the exam room, Curran initially conducted a Live Blood Analysis. Curran pricked PI Correia's right index finger and smeared blood on three (3) glass slides. Curran stated the microscope he was utilizing was not hooked up to the monitor screen at this time and he would let PI Correia look into the microscope viewfinder if he found something.

82. Curran then placed a blood slide on the microscope and told PI Correia that his blood cells should be perfectly round. He had PI Correia look in the microscope and noted that the blood cells were not round. Curran showed PI Correia a picture of healthy blood cells and

then a picture of what PI Correia's blood cells looked like. Curran stated it was Rulo [sic], which could be, amongst other things, degenerative disease, liver disease, cancer, etc. Curran told PI Correia that he did not know exactly what it was but that PI Correia's system was not functioning correctly.

83. Curran stated the next blood slide could give him an answer. He then requested that PI Correia go to the bathroom and provide a urine sample. When PI Correia returned to the exam room, Curran tested the urine and stated that it was normal. Curran then looked at another blood slide and told PI Correia that he did not have any tumors but did have heavy metal, probably heavy metal poisoning. Curran stated that PI Correia had a yeasty buildup that could trigger a premature disease if not treated.

84. Curran stated the next test would check PI Correia's electroconductivity. A clear liquid was placed in the palm of PI Correia's hand and he was given a small bar (approximately five inches long) to hold in the hand. On the computer monitor screen there was a graph labeled Bio Meridian Health Assessment, which would tell Curran if the organ tested is stressed or weakened. Curran touched PI Correia's other hand and foot with a pen like device, producing readings on the graph. While touching the pen like object to PI Correia's foot, Curran told PI Correia that his liver was super stressed. Curran stated 17 out of 62 bodily functions were in the norm. Curran explained that the body fires electricity and this machine checks the firing of that electricity, which occurs in every area of one's body. Subsequent to conducting the test, Curran provided PI Correia with a printout of the results. Curran stated that PI Correia's weakest areas were his right lung and small intestines. The assessment indicated that only 17 out of 62 bodily functions were operating in a "balanced" state with the others being either "stressed" or

"weakened." Included in those systems that were identified as stressed or weakened were the lymphatics, lungs, large intestine, nervous system, circulation, allergies, cellular metabolism, endocrine system, small intestine, connective tissue, gallbladder, kidneys and urinary bladder. Curran advised PI Correia that after continuous visits to his office, PI Correia would be perfect.

85. During the meeting, PI Correia asked Curran if he should be concerned that his blood cells were not round. Curran advised that they were round but coagulated and clumpy, which could cause heart attack and stroke if it caused blockage of the arteries. Curran stated that because PI Correia's blood was clumpy he couldn't read it in that state. Curran then stated he could get PI Correia into a program that would make him perfect.

86. Curran suggested a rejuvenation program consisting of not eating for 30 days while subsisting on the "Green Drink," which would repair every cell in PI Correia's body. Curran also advised that PI Correia could drink the Green Drink for breakfast and lunch but eat a good dinner at night. Curran stated that this protocol would make PI Correia perfect and keep him there. This protocol would stop PI Correia's blood cells from sticking together. Curran advised PI Correia that the Green Drink formula took him ten years to formulate and that he puts 100 products in the formula. Curran informed that it took half a year, working with scientists, to put the 100 products in the drink. Curran stated the drink totally repairs every cell in the body. PI Correia told Curran that he would purchase the supplements he suggested. Curran gave PI Correia a list of items totaling $2,715.82, which included the full body exam. PI then stated he would purchase the items at a later date.

87. The exam, at a cost of $950.00, was paid for by official government funds, supplied by the FDA, using an undercover MasterCard credit card. Your affiant subsequently

contacted MasterCard and was advised that the transaction cited resulted in a wire of funds in the amount of $950.00 to the U.S. Bank National Association located in Knoxville TN. Your affiant is aware that company is a credit card clearing house. Funds from that institution were then wire transferred to Citizens Bank in Rhode Island, Account No. 1452-751-0, held in the name of The Northeastern Institute for Advanced Natural Healing

88. On October 19, 2004, PI Correia met with Dr. Paul J. Agatiello, MD., F.A.C.P. for the purposes of receiving a comprehensive medical exam as a second opinion to diagnosis received from Curran during Correia's October 8, 2004 exam. In his Summary Statement, Dr. Agatiello wrote "[t]o a reasonable degree of medical certainty, this physician finds NO evidence by history or physical examination of abnormalities of the lymphatics, lungs, large intestine, nervous system, circulation, allergies, endocrine system, small intestine, connective tissue, gallbladder, kidneys or urinary bladder."

89. Your affiant's investigation determined that PI Correia is the first person identified in this case that has not been diagnosed with deformities, such as parasites or worms, in his blood. According to PI Correia, during his exam with Curran, blood was drawn from his finger and placed under the microscope. Curran told PI Correia that the computer screen monitoring system, which Curran has used with all other identified patients to show the presence of parasites, was not hooked up and was not being used.

90. Your affiant is aware that just prior to PI Correia's visit, Frank S. Lombardi, attorney for AD, sent a letter from his office on September 7, 2004. In that letter attorney Lombardi accused Curran, among other things, of performing unnecessary work and charging expensive fees. Lombardi also notified Curran that his client had requested a stop payment on the

check she wrote to him and that she had notified the Board of Medical Licensure regarding her visit to Curran's office. P.I. Correia visited Curran after the letter was sent to Lombardi.

91. Also, of note, at the bottom of PI Al Correia's BioMeridian Stress Assessment analysis, provided by Curran, the following is written: "The MSAS equipment does not provide a medical diagnosis. If patients feel they need a diagnosis, they should consult with their physician."[2] Your affiant has reviewed similar assessment analysis reports provided to other patients of John Curran. That review revealed that in all cases, for patients seen prior to PI Correia and prior to the Lombardi letter, no such statement is made.

## VI. Peer Review of Curran's Treatment Protocol

92. In addition to the statements obtained above from Dr. Jennifer Jeremiah and Dr. Noubar Kessimian, I have also reviewed comments by a third doctor regarding Dr. Curran's methods. As part of its initial investigation, the RIDOH forwarded copies of Curran's promotional documents for review by Doctor Tim Gorski, MD Fellow at the American College of Obstetrics and Gynecology (FACOG). On November 4, 2002, Dr. Gorski wrote a letter in response to the forwarded materials. Your affiant has reviewed Dr. Gorski's assessments in which he provides his medical opinion that many of Curran's treatments are of an unproven or disproven nature. In particular part, Dr. Gorski provided the following information to RIDOH:

> The "BioMeridian Stress Assessment" appears to be a variation on electrodiagnostic methods that are well-known forms of medical fraud. The procedure consists of grounding the patient, then using a probe to pass low levels of electrical current through the patient. Various dials connected to the circuit are then claimed to measure the status of the

[2] Despite the disclaimer that has been added to the Stress Assessment test, based upon your affiant's review of the audiotapes of both undercover visits by TFA Faella and PI Correia, Curran never verbally advised either that he could not provide the diagnoses and that they should consult their physician if they felt they needed a diagnoses.

> patient's health. However, the resistance/current measured only reflects nonspecific effects such as how hard the probe is pushed against the patient.

93. Dr. Gorski also stated that naturopaths do not prevent, cure, diagnose or treat disease.

## VII. Glen Lynch

94. On May 11, 2004, your affiant along with PI Al Correia interviewed Glen Lynch. Glen Lynch had contacted the RIDOH and requested a meeting to discuss John Curran. Glen Lynch provided your affiant the following information, in substance:

95. Glen Lynch informed that he is the brother-in-law of John Curran. Glen Lynch stated that John Curran was engaged in certain unethical activities for which Glen Lynch had specific information. Glen Lynch stated that he was, until recently, employed by Curran at his medical office and as the day-to-day operator and owner of Eve's Herbal Garden, a vitamin supplement store on 743 Reservoir Avenue in Cranston, RI. Curran's previous practice, Rhode Island Health Aid, was originally at the same address on Reservoir Avenue. According to Glen Lynch, Curran was the real owner of Eve's Herbal Garden with Glen Lynch holding the title in name only.

96. Glen Lynch stated that he was asked by Curran to create a "Super Green Drink" formula sold by Curran to his patients. Glen Lynch provided investigators with a notepad, which he claimed identified the formula he used to create the "Green Drink" and listed the cost of each of the various ingredients in the formula. When Curran had originally asked Glen Lynch to create the drink, he told him to "make it green and make it taste good." Glen Lynch advised that he has no scientific background but attempted to create a formula that contained various healthy

nutrients. Glen Lynch stated that Curran would charge up to $1,200.00 for a bucket of the powder. Glen Lynch left the employment of Curran after Curran had approached him regarding the cost of the formula. Curran wanted Glen Lynch to cut the expenses and to just keep it green and tasting good. Glen Lynch stated that he could not honor that request, stating that he felt it was wrong, and that it led to his having a falling out with Curran. Glen Lynch provided your affiant with a jar containing the green drink formula.

97. With regard to the "E-Water" that Curran sold, Glen Lynch stated that Curran would purchase gallons of distilled water, which he would place in a transparent like box with a rod in it, which was connected to a plug in electrical power source. Curran would pour the water in the box and let it sit there for a while. Glen Lynch surmised that the box was transparent so that if someone looked at it would appear as if something was happening to the water. Glen Lynch stated that upon his leaving the employment of Curran he had taken the apparatus, which Glen Lynch provided to your affiant.

**VIII. <u>The Money</u>**

98. Glen Lynch has advised your affiant that Curran's business generated significant amounts of cash and that Curran had personally shown him large amounts of cash. Glen Lynch stated that Curran told him that he could not deposit the money into the bank in amounts over $10,000 because of, as Glen Lynch remembers it, "some IRS rule." Glen Lynch also stated that, with regard to his medical practice, Curran told him that he "wanted to make a couple of million bucks and get out." During his undercover visit to Curran's office, TFA Al Faella saw a safe in Curran's office, to the left of his desk, under a credenza.

99. Glen Lynch further informed your affiant that he and Curran had engaged in some fraudulent financial transactions with Glen Lynch's American Express Card and Curran's business, Rhode Island Health, when it was still on Reservoir Avenue. According to Glen Lynch, Curran devised a scheme whereby Curran would bill Glen Lynch's Amex card for fictitious purchases at the store and then split the cash received by the business with Glen Lynch. Glen Lynch stated that both he and Curran were aware that Glen Lynch would not be paying back the charged moneys.[3]

100. American Express has provided your affiant with records for the account of Glen P. Lynch (Acct. No. 3715-628432-52008 & 3721-217118-34008). A review of those records indicates that there was in excess of $33,000.00 in charges from Rhode Island Health. Those charges were almost exclusively in round thousand dollar allotments. According to Cathy Curran (No relation) Senior Special Agent, Northeast Region, for American Express, the GL Accounts have not been paid.

101. As part of this investigation, your affiant and other participating investigators have also reviewed numerous financial documents.

102. Your affiant has reviewed records provided by the Rhode Island Department of Administration, Division of Taxation-Employer Tax Section. Those records pertained to wages paid by The Northeastern Institute of Advanced Healing. A review of those records indicates that for calendar year 2003, John Curran claimed wages totaling $21,000. For the first two (2) quarters of calendar year 2004, John Curran reported wages totaling $12,500.

---

[3] Your affiant is also aware that Glen Lynch has previously pled nolo contendere to two state charges of simple assault/domestic and va^n^dalism.

103. Your affiant has determined that John E. Curran currently resides at 66 Falcon Ridge Drive, Exeter, RI. The residence was purchased on August 2, 2004, and the listed owners are John E. Curran and Colleen R. Brophy. The home was purchased for $465,000.00 from Thomas and Valeria Guest. The mortgage payment for the residence are made by John Curran utilizing funds from The Northeastern Institute for Advanced Natural Healing (Citizens Bank Checking Account No. 1452-751-0)

104. Your affiant has reviewed records from GE Capital relating to The Northeastern Institute for Advanced Natural Healing. GE Capital is the issuing company behind the CreditCare card application that is utilized at Curran's practice. Medical practitioners utilize the card for patients who are in need of a financial payment plan to receive services. SA Robert Ferraro has conducted an analysis of payments made by GE Capital to The Northeastern Institute for Advanced Natural Healing (Citizens Bank, Account No. 1452-751-0). That analysis indicates that for the year 2003, GE Capital sent a total of $120,413.16 in credit deposits to the Citizens Bank account. For the year 2004, to date, similar deposits have been made totaling approximately $210,216.00. Investigation by your affiant has determined that payments made to the identified account are done so by bank wire transfer. Upon approval of credit from GE Capital, a Credit Care card is sent to the client via the U.S. Mails. Subsequent payments to GE Capital can be made by sending payment via the U.S. Mails.

105. As stated above, your affiant's review has determined that it appears that receipts from Curran's business are deposited into Citizens Bank, Account No. 1452-751-0. To date, the investigation has traced certain payments that relate to fraudulent services into Account No. 1452-751-0.

106. On August 13, 2004, LM, the patient identified above, paid $2,000 to Curran's business by using a Visa credit card issued by Household Bank SB NA. Household Bank has confirmed to SA Robert Ferraro that it issued a payment on behalf of LM to The Northeastern Institute for Advanced Healing.

107. Your affiant is also aware that Visa and MasterCard payments are typically processed through a clearing house. On January 5, 2005, your affiant spoke with a representative at Merchant Services. Your affiant was informed that Merchant Services is a credit card clearing house bank. Your affiant was advised that Merchant Services collects payment for credit card charges made through individual companies that utilize a credit card machine provided by Merchant Services or a wholesaler associated with Merchant Services. Your affiant was advised that charges are "bundled" and then monies are forwarded to the client after subtracting the fees charged by Merchant Services. Additionally, clients provide Merchant Services with a single bank account where funds are to be forwarded.

108. Your affiant has determined that John Curran utilizes Merchant Services and that charges made from his company are forwarded to Citizens Bank Account No. 1452-751-0. Your affiant has also reviewed bank statement for Citizens Bank Account No. 1452-751-0 and identified what appear to be numerous deposits of bundled payment items from Merchant Services, including deposits that occurred after August 13, 2004, when ML used her Visa card to pay Curran.

109. Your affiant is also aware that Merchant Services was utilized by John Curran to process the credit card payment for services he provided to PI Al Correia as fully described above at paragraph 87.

110. In addition, as explained above at paragraph 77, TFA Faella purchased supplements from Curran with official government funds, supplied by the FDA, using Sovereign Bank check No. 109 for the total sum of $3,729.00. Sovereign Bank subsequently provided your affiant with a copy of the cited check which indicated that it had been deposited into Citizens Bank, Account No.1452-751-0, held in the name of The Northeastern Institute for Advanced Natural Healing.

111. The investigation has revealed that the proceeds of the scheme are being used to promote the scheme because the funds deposited in the Citizen's Bank account are used to make payment on the business' American Express Account. A partial review of Citizens Bank records for Account No 1452-751-0, for the time period of January 2004 through September 2004, identified monthly checks being made payable to American Express Business Platinum Card, Account No. 3727-150577-83006 83006, held in the name of Dr. John E. Curran/The Northeast Institute. The identified checks include the following: Check No. 2306 written on January 6, 2004 in the amount of $15,591.70; Check No. 5472 written on or about March 1, 2004 in the amount of $23,788.69; Check No. 5666 written on May 1, 2004 in the amount of $27,137.34; Check No. 5769 written on June 13, 2004 in the amount of $17,841.78; Check No. 5820 written on June 28, 2004 in the amount of $28,513.95; Check No. 5930 written on August 6, 2004 in the amount of $14,700.23; and Check No. 2567 written on September 15, 2004 in the amount of $24,935.30

112. Your affiant has conducted a partial review of statements from American Express Business Platinum Card, Account number 3727-150577-83006, for the time period of October 2003 through September 2004, held in the name of Dr. John E. Curran/The Northeast Institute,

One Richmond Square, Suite 310E Providence, RI. The review identified checks being made payable to various corporations engaged in providing products and services utilized by Dr. John E. Curran and the Northeast Institute of Advanced Natural Healing in the furtherance of a scheme to defraud. The following purchases took place after Curran had seen ML, TFA Faella and PI Correia.

113. On August 26, 2004 and September 29, 2004, payments, each in the amount of $5,046.61, were made to Practice Builder Business Services. The investigation has revealed that Practice Builder Business Services is a company engaged in providing medical practices with strategic marketing services. The company provides, among other services, web design and strategies, company promotional design, typesetting and placement and mailing and physician and patient retaining and referral building.

114. On September 3, 2004, a payment of $19,190.00 was made to BioMeridian Inc., located in Utah. As stated above at paragraph 29, this corporation sells BioMeridian Stress Assessment devices, a device utilized by John E. Curran and described in detail in this affidavit.

115. Numerous payments have been made to Chi's Enterprise, a corporation that the investigation has revealed is engaged in the sale of herbal supplements. The payments include a payment was charged in the amount of $728.00 on August 17, 2004.

**IX. <u>Computer Search Issues</u>**

116. As used in the Affidavit, the term "computer" includes "computer software and memory," which refers to digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic,

optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word-processing, graphics, or spreadsheet programs).

117. Based upon my training, experience, participation in other fraud and drug investigations, and discussions with other law enforcement officers experienced in the use and retrieval of computer-generated information, I am aware that computer storage devices (like hard disks, floppy disks, tapes, laser disks, and Bernoulli (drives) can store the equivalent of thousands of pages of information. Additionally, a person engaged in fraud may try to conceal criminal evidence, such as by storing it in random order with deceptive file names. This may require the qualified computer experts to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.

118. During the course of this investigation, your affiant has consulted with other Special Agents, including FDA SA Special Agent Phil Walsky. SA Walsky has been a Special Agent with FDA for six years. Prior to FDA, SA Walsky was a special agent with the United States Secret Service. SA Walsky has been performing computer forensics since 1997, when he received computer forensics examination training and certification while he was with the Secret Service. He has continued to perform computer forensics as a Special Agent for the FDA's Office of Criminal Investigation. SA Walsky has received training and has gained experience in the usage of specialized computer software and hardware which assists him in examining seized computers. He performs dozens of computer forensic exams a year. The training SA Walsky has received includes Seized Computer Evidence Recovery (SCERS) training at the Federal Law Enforcement Training Center, in Georgia in1997, and numerous continuing training over the following years. This continuing training covers various topics of computer forensics

investigations such as legal issues, software and hardware components, internet and email dynamics, and other computer related topics. He has received additional training for various forensic software and hardware tools that I use for computer examinations.

119. Based on your affiant's experience in fraud investigations, consultation with other special agents and discussions with Special Agent Walsky, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

120. Also based on discussions with Special Agent Walsky, your affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, the warrant application requests permission to search and seize records that may be stored on a computer. These records constitute evidence of crime, and your affiant believes that, in this case, the computer hardware is a container for this evidence. This affidavit also requests permission to seize the computer hardware that may contain the records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site.

121. Based upon discussions with Special Agent Walsky, your affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a. The volume of evidence. Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to

determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b. Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

122. Your affiant recognizes that the computer(s) located at One Richmond Square, Suite 310-E, Providence, R.I. may be used by functioning companies, and that a seizure of the computers may have the unintended and undesired effect of limiting the companies' ability to engage in business. In response to these concerns, the agents who execute the search will take an incremental approach to minimize the inconvenience to any legitimate business that may be

occurring at this address and to minimize the need to seize equipment and data. This incremental approach, which will be explained to all of the agents on the search team before the search is executed, will proceed as follows:

a. Upon arriving at One Richmond Square, Suite 310-E, the agents will attempt to create, while at One Richmond Square, Suite 310-E, an electronic "image" of the information stored on the computer(s). Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer expert or another technical expert will then conduct an off-site search for the computer files described in the warrant from the "mirror image" copy at a later date. If the computer expert successfully images the computers, the agents will not conduct any additional search or seizure of the computers.

b. If "imaging" on-site proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer expert believes must be seized to permit the agents to locate the computer files described in the warrant at an off-site location. The components will be seized and taken in to the custody of law enforcement agents. If employees of One Richmond Square, Suite 310-E, so request, the computer expert will, to the extent practicable, attempt to provide the employees with copies of any files that may be necessary or important to the continuing function of legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

## CONCLUSION

123. Based on the foregoing, including: (1) the purported diagnoses that patients had abnormalities in their blood, including parasites; (2) the efforts to sell products to the patients, such as the green drink and E-water, and misrepresentations regarding their development and potential; (3) the undercover operations that showed that Curran had falsely diagnosed the conditions of the undercover agents; (4) the patient complaints and summaries; (5) the medical opinions that indicate that parasites in the blood should only occur in patients with malaria, a disease not present in this geographical area; (6) Curran's statements to Glen Lynch that he could not deposit cash in amounts greater than $10,000 at a bank and the he intended to "make a couple of million bucks and get out;" (7) Curran's use of interstate wires to conduct financial transactions resulting from his scheme; and, (8) Curran's use of the mails to respond to and deflect inquiries from the RIDOH regarding patient complaints, I believe that probable cause exists that John E. Curran, through his activities at The Northeastern Institute for Advanced Natural Healing, One Richmond Square, Suite 310-E, Providence, Rhode Island has engaged in the following illegal activity: (1) Mail Fraud in violation of 18 U.S.C. § 1341; and (2) Wire Fraud in violation of 18 U.S.C. § 1343.

124. Based upon the foregoing, including: (1) the deposits of fraudulently obtained proceeds into Citizen's Bank Account No. 1452-751-0; (2) the use of the funds in the Citizen's Bank account to pay American Express Business Platinum Card, Account No. 3727-150577-83006, bills addressed to Dr. John E. Curran/The Northeast Institute; (3) and the charging of expenses intended to promote the scheme to the American Express account, I believe that probable cause exists that John E. Curran, through his activities at The Northeastern Institute for

Advanced Natural Healing, One Richmond Square, Suite 310-E, Providence, Rhode Island, has conducted financial transactions involving the proceeds of the specified unlawful activities of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), with the intent to promote the carrying on of said specified unlawful activities, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

125. I further believe, based on the foregoing facts and circumstances, there is probable cause to believe that evidence, fruits, any instrumentalities of illegal activity by John Curran, as more fully described in Attachment B, are presently located on the premises at One Richmond Square, Suite 310-E, Providence, Rhode Island, at the office and principal place of business of The Northeastern Institute for Advanced Natural Healing. I respectfully request that the Court issue a search warrant for those premises as described in Attachment A, authorizing seizure of items described in Attachment B, which I incorporated by reference as though fully set forth in the Affidavit.

126. Based upon the above information, there is also probable cause to believe that Citizen's Bank Account No. 1452-751-0 is being used with the intent to promote the carrying on of the specified unlawful activities of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), and in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and that said account contains the traceable proceeds from the above violations. Thus, all funds in this account are forfeitable to the United States pursuant to 18 U.S.C. § 1956, or constitute property traceable to such property.

Jason Simonian

JASON A. SIMONIAN
Special Agent
Food and Drug Administration
Office of Criminal Investigations

Subscribed and sworn to before me
this 6th day of January, 2005 at
Providence, Rhode Island.

David L. Martin

David L. Martin
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

Premises to be searched: One Richmond Square, 310-E, Providence, Rhode Island.

The premise to be search is located within One Richmond Square, at Suite 310-E, which is located on the third floor of the complex. The entrance door to the office is identified as "310-E."

Suite 301-E, is described as follows: Upon entering the suite there is a patient waiting area. To the right is a bathroom and to the left is a half door, which leads to the "Pharmacy" area. Supplement stock is in view on the shelves in the pharmacy area. A doorway, which leads from the waiting room to the main interior office, is located adjacent to the bathroom door. To the right of the main interior office is a room with "therapy" equipment. Across from that room is John Curran's office. Located on one side of Curran's office is a "thermal imaging room" and on the other side of the office is a room where exams are conducted. There is also door located next to the desk in the main interior office.


Lift Rm
Bath Rm
Desk
Thermal Imaging
Curtis Office
Exam Rm.
Supplement Rm.
Lift Door
Entrance door
One Richmond Sq. Suite 310-E
Providence, RI

ATTACHMENT B

1. Any and all patient files and billing records and documents, to include any log books, notebooks, or records, regarding patients of the Northeastern Institute for Advanced Natural Healing Institute, to include written, recorded, printed or electronically stored materials.

2. Telephone logs, telephone messages, fax messages and all correspondence relating to the purchase and production and distribution of any supplements, to include "E-Water" and the "Green Drink", distributed by John Curran and/or the Northeastern Institute for Advanced Natural Healing.

3. All quantities of supplements to include, but not limited to, "E-Water" and the "Green Drink."

4. Devices used in the diagnosis of clients, to include but not limited to; devices used to conduct "blood analysis," "thermal imaging," and "BioMeridian stress assessment," tests.

5. Devices used in the treatment of patients, to include but not limited to; (1) hydrotherapy massage machine; (2) spectra color spa system; (3) hyperbaric chamber; (4) hydro massager with infra red light; (5) ionic cleaner; (6) massage capsule; and (7) personal sauna with white plastic hoses.

6. Financial statements, wire transfers, checking account information, deposit information to include safety deposit box records, credit debit memo records, business financial records, business files containing account history or individual transactions or mailings, currency, state and federal tax records, corporate records and business licenses operational records, business brochures, employee records, training records, qualification certificates, and complaint correspondence.

7. Any safe or similar item that may used to store the fruits of the alleged scheme, including cash.

8. Computer systems, databases, computer programs, software, computer manuals, word processors, magnetic media, all of which are related to the Northeast Institute of Advanced Natural Healing.

The terms "records" and "documents" include all documentary material whatever form and whatever means the records and documents, their draft, or their modifications may have been created or stored, including but not limited to, any handmade form (such as writing, drawing) any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photos, motion pictures, photo copies); any mechanical form (such as writing, printing or typing); any electrical, electronic, or magnetical form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks CD-ROMS, optical disk, printer buffers, smart cards, memory calculators, electronic dialers, ZIP drives, burnable drives, or electronic notebooks, as well as printouts or readouts from any magnetic storage devices.